Filed 4/29/20

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.R. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.M.,<br><br>Defendant and Appellant. | F079971<br><br>(Stanislaus Super. Ct. Nos. VJDP-19-000154 & JVDP-19-000155)<br><br>**OPINION** |

APPEAL from orders of the Superior Court of Stanislaus County. Ann Q. Ameral, Judge.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Maria Elena R. Ratliff, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

* Pursuant to California Rules of Court, rules 81105(b) and 8.1110, the opinion is certified for publication with the exception of part II. of the Discussion.

On June 20, 2019, the Stanislaus County Community Services Agency (Agency) received a referral indicating law enforcement had responded to a fight between Mother and Father.  Father reportedly strangled Mother until she "blacked out."  Mother had been holding 2-year-old F.M. at the time.  Three-year-old M.R. witnessed the incident.  Father was arrested.

The next day, social workers "attempted to make unannounced contact with the family and were unsuccessful."  On June 26, 2019, a social worker called Mother but discovered it was "not a working number for [Mother]."

*Events of June 27, 2019*

On June 27, 2019, the Agency received a separate referral indicating law enforcement had responded to a domestic violence dispute between Mother and paternal uncle R.Q.  R.Q. said Mother was a methamphetamine user.  R.Q. was concerned about her drug use, the "horrible" conditions of her home, and Mother leaving the children with strangers.  R.Q. attempted to "take" F.M. and M.R. because Mother had a "felony warrant out of Sacramento."  Mother then "became violent."  Mother was then "arrested for a felony warrant," and the Agency was contacted because Mother's arrest left F.M. and M.R. without a caregiver.  The Agency detained the children.

That day, a social worker interviewed Mother.  She appeared "disheveled and incoherent as she presented in disarray, disorderly, frazzled, and repetitive."  While Mother admitted she had previously used and sold methamphetamine, she denied any current drug use.  As for the prior domestic violence incident, Mother said Father had choked and slapped her until she became unresponsive.  Mother claimed this was the first time Father had ever gotten physical with her.  Mother acknowledged F.M. and M.R. were present when the incident occurred.

Mother and Father both believed F.M. and M.R. were autistic.

*Dependency Petition*

On July 1, 2019, the Agency filed a dependency petition. (Welf. & Inst. Code, § 300.)[1] The petition summarized the events of June 20, and June 27, 2019. The petition alleged that those events established the children have suffered, or were at substantial risk of suffering serious physical harm or illness as a result of the failure or inability of the parents to supervise or protect the children adequately, and as a result of the inability of the parent to provide regular care for the children "due to the parent's … mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).)

The petition also alleged the children had been left without provision for support (§ 300, subd. (g)) due to the incarceration of both parents.[2] However, the allegation that Father was currently incarcerated was subsequently crossed out by hand.

On July 2, 2019, Mother filed a Parental Notification of Indian Status form (Judicial Council Form ICWA-020). On the form, Mother indicated, "I may have Indian ancestry." Mother left blank the area designated for Mother to identify the name of any tribe.

The detention hearing was continued to July 5, 2019, to allow for Father's presence. At the continued detention hearing, the following exchange occurred:

> "THE COURT: And, [Mother], you indicated that you may have Native American ancestry.
>
> "THE MINORS' MOTHER: Yes.
>
> "THE COURT: Do you happen to know any particular tribe?
>
> "THE MINORS' MOTHER: My mom and dad are both passed already.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] The allegation that Father was incarcerated was subsequently stricken at an August 15, 2019, hearing.

3.

"THE COURT: So you have no one with whom you could inquire?

"THE MINORS' MOTHER: (Shakes head.)

"THE COURT: All right. Because if you don't have any information, the Court can't – doesn't really have any information to believe the Indian Child Welfare Act applies.

"In the event you figure out someone or you get some information, make sure you let us know as soon as you obtain that information so that inquiries can be sent out. But in the meantime, the Court will find that there is not sufficient information upon which to believe that the Indian Child Welfare Act applies."

Father denied Indian ancestry.

After the detention hearing, Mother was moved from Stanislaus County Jail to Sacramento County Jail, with a scheduled release date of October 29, 2019. The social worker confirmed that Mother was able to engage in parenting courses, substance abuse treatment programs and cognitive behavioral therapy while incarcerated in Sacramento County Jail. Mother understood that she was to "contact the Agency as soon as she is released from jail to ensure that she is set up with any additional services she is required to participate in."

M.R. had previously been enrolled at a regional center for "Applied Behavioral Analysis" services. Once M.R. turned three years old, the services became the school district's responsibility. Mother declined all services once M.R. turned three because she did not approve of the school at which M.R. would have been enrolled.

*Police Report*

On July 13, 2019, the police report of the June 14, 2019, incident was released to the Agency. The report detailed that Father admitted he had been drinking and had pushed Mother. However, Father claimed he acted in self-defense and denied hitting Mother. Father was upset that his ex-girlfriend (apparently referring to Mother), has her boyfriend spend the night at the apartment.

A few hours later, Mother called 911. An officer observed Mother with visible bruises, scratches, red marks and "injuries to her neck." Father said he did not know how Mother received the injuries and was promptly arrested.

Mother said Father had come to the apartment to give her a rent check. Father had been drinking. The two began to argue over custody of the children. While Mother was holding a child, Father placed his hand on Mother's throat and strangled her. Father said, " 'I hate you bitch, I am going to kill you.' " According to Mother, both of her children were present for the incident.

*Mother's Case Plan*

Mother's case plan was signed by the social worker on July 29, 2019. The case plan listed several "objectives" for Mother's services, including staying sober, monitoring and meeting her children's needs, and obtaining suitable housing.

The case plan also listed several "client responsibilities." The "completion date" for each of the responsibilities was about one year in the future, January 30, 2020.

Among the responsibilities listed were the following:

> "[Mother] will attend, actively participate and successfully complete individual counseling services at Sierra Vista Child Family Services or another program approved of by the social worker and follow all recommendations. Individual counseling will focus on issues pertaining to: domestic violence victim issues and corresponding anger, healthy coping skills, drug abuse and effects on children, demonstrating she can protect from future abuse and any other issues identified by the father and/or clinician." [¶] … [¶]

> "[Mother] will attend, actively participate and successfully complete a parenting program offered at Sierra Vista Child Family Services or another program approved of by the social worker and follow all recommendations." [¶] … [¶]

> "[Mother] will attend and actively participate in an SUD assessment and follow all recommendations from the assessment, which may include a substance abuse treatment program as offered by Nirvana Drug and Alcohol Treatment Program, Stanislaus Recovery Center or First Step Perinatal Program, or another program approved of by the Social Worker.

5.

She will follow all recommendations of the program, including but not limited to, residential treatment, outpatient substance abuse services, clean and sober living, attending a 12-Step Program, and random drug testing as approved by the Social Worker."

The other two items listed under "CLIENT RESPONSIBILITIES" were child, family, and team meetings every six months, and random drug testing.

A jurisdiction/disposition hearing was held August 15, 2019. At the hearing, Father's counsel requested that the court strike the phrase " 'to follow all recommendations' " from the case plan. The court ultimately "trailed" the hearing to the next day because some of the attorneys had been working off of an old version of the case plan. The matter was then set for a contested hearing on August 30, 2019.

*Contested Hearing*

A contested hearing was held regarding the case plan's inclusion of the "follow all recommendations" language. The court noted it was a "test case" for the county – meaning it could influence how case plans are prepared in the future.

Mary Ann Cose's Testimony

Mary Ann Cose, a supervisor at Sierra Vista Child and Family Services (Sierra), testified. Prior to working as a supervisor, she had been a clinician at Sierra. Cose testified as an expert in providing reunification services, to wit: parenting education, clinical assessments, and individual counseling.

In her work at Sierra, Cose had reviewed an estimated 1,000 case plans. Case plans identify specific topics for Cose to work on with the parent. However, sometimes Cose would identify additional "needs" the parent had that were not listed on the case plan. She needs to ask for an additional service for a parent that was not specifically recommended in 25 to 50 percent of her cases. If the case plan included "follow all recommendations" language, she could immediately begin working on the issue with the parent. However, if the "follow all recommendations" language is not in the case plan, then she could not begin addressing the issue with the parent until a new case plan is prepared and approved by the court.

Thus, the "follow all recommendations" language is useful to Cose because it avoids a break in time between identifying an unlisted issue and beginning to provide the remedial service to the parent. If there is a break in time, "it can be hard and difficult to get back on track or resume where we left off in turn almost hindering the client [i.e. parent] where we have to start over again."

Sometimes, delays of more than 30 days would involve changing clinicians. In that situation, the new clinician would need to develop rapport with the parent – effectively having to "start over" with the service.

At Sierra, a clinical assessment of the parent is done to determine whether there are any other services that would be beneficial. Such additional services could include individual counseling, anger management, domestic/violence/batterer groups, or psychological evaluations.

### Social Worker Daisy Avila's Testimony

Daisy Avila testified that she is a social worker with Stanislaus County Child Protective Services. Avila was trained in preparing case plans. Avila prepares case plans as part of her job duties with the Agency.

In order to have the Agency pay for a service for a parent, the social worker must fill out an "encumbrance" form. Avila testified that it takes "about a week" to get an encumbrance "taken care of." If a clinician recommends an additional service to a parent during individual counseling – such as the parent should participate in an anger management group – that would require a separate encumbrance. In other words, the encumbrance for individual counseling only covers individual counseling sessions; not additional services that may be recommended through individual counseling.

Avila includes the phrase "follow all recommendations" in her case plans to "make sure that there's no gap in between services" and to "make sure that those things are addressed as soon as possible because we know that time is ticking." In the present

case, since there was a child under three years old, the reunification period was limited to six months.

The phrase "follow all recommendations" is used with respect to individual counseling services "because sometimes other topics that come up when the parents are going to their sessions and also because sometimes the clinicians recommend for the parents to do any additional anger management or coparenting, codependency, any other programs that could be beneficial to the parent."

The phrase "follow all recommendations" is important for parenting education services as well "because we do have children that are very young and high needs … sometimes there's a recommendation to add additional parent/child labs or other additional parenting classes that would be beneficial to the parents."

The phrase "follow all recommendations" is used with respect to general counseling because "[t]he clinician may ask for … additional sessions to address, maybe mom is not done processing the concerns that we have, any domestic violence, any past concerns, past trauma, or anything like that; and also because again the children are very high needs and so also making sure that mom had that support."

In terms of what would fall under the phrase "follow all recommendations," the social worker said " 'everything' " – meaning any "other services such as anger management, additional sessions with the clinician, additional parent/child labs, group sessions, individual sessions, family sessions, coparenting, codependency, psych eval, clinical assessment."

*Argument*

After the conclusion of testimony, counsel for the Agency argued the court should permit the case plan's use of the phrase "follow all recommendations." She cited to section 16501.1, subdivision (14), arguing that the Agency has inherent power to modify the case plan between review hearings without court approval. She argued that section

16501.1, subdivision (f) gives the court broad discretion to fashion dispositional orders in accordance with what the court concludes would be in the best interests of the children.

She also argued that the Agency relies on the contracted experts at service providers like Sierra to determine the scope of services needed. While social workers identify the initial needs of a parent, it is with a clinician's purview to identify additional needs. If the Agency did not do this, parents might argue that they were not provided with reasonable services. The Agency is simply trying to provide "the most comprehensive case plan that addresses the needs of a parent, and we are relying on the clinicians, the experts in this case, to have the ability to give the services to the parents at the earliest possible moment once it becomes known …."

The Agency suggested that language could be added to the case plan to the effect that if a psychological evaluation were recommended, the Agency would notify the parent and they would have an opportunity to object.

The Agency also noted that a parent can always seek contest a recommended service under section 388.

Father's counsel argued case plans should only have those services *needed* to reunify – not every service that might benefit a parent. He also contended that case plans must identify the services required with specificity. The phrase "follow all recommendations" is not limited or specific.

Father's counsel said he would not have a problem with a social worker invoking the "follow all recommendations" phrase under the domestic violence portion of the case plan, so long as the recommendation was related to domestic violence. For example, counsel would not object if the domestic violence counselor recommended anger management classes. In other words, "as long as [the phrase] is not used to order something unrelated to domestic violence." Counsel argued the problem with the phrase is that it is "wildly overbroad" such that a domestic violence counselor could say the parent needed something unrelated, like a psychological evaluation.

9.

Mother's counsel argued that if the court retained the "follow all recommendations" language, it should add text to the case plan saying: " '[P]arent's right to challenge any additional services pursuant to the same evidentiary burdens and standards associated with the disposition hearing is preserved.' "

Later, Mother's counsel requested the court strike the phrase "follow all recommendations" and replace it with: " 'In the event that additional individual counseling sessions, group counseling, or so forth are needed, the parent will agree to that as well.' "

In rebuttal, deputy county counsel argued the phrase "follow all recommendations" does not give the Agency "unfettered discretion" because, as the social worker testified, "the services that would be recommended are within the purview of what the agency can offer." Specifically, recommendations would be limited to family counseling, couples counseling, codependency, individual, anger management, domestic violence, individual, parenting, substance abuse, "and so forth."

*Ruling*

The court ruled that the phrase "except a psychological evaluation" would be added wherever "follow all recommendations" appeared in the proposed case plan. Otherwise, the court ruled in favor of the Agency.

*Jurisdiction*

The court struck from the dependency petition an allegation that Father had been charged with child cruelty. The court also struck the allegation that Father was incarcerated.

The court found true the allegation that the minors were persons described by subdivisions (b)(1) and (g) of section 300.

*Disposition*

The court adjudged the children dependents of the court and continued their removal from the parents. The court granted reunification services to both parents.

10.

# DISCUSSION

I.     The "Follow all Recommendations" Language in the Case Plan Fails to Satisfy
       Section 1650.1, Subdivision (g)(2)

    *A.     Case Plans*

"[T]he central unifying tool in child welfare services" is called the "case plan."
(§ 16501.1, subd. (a)(1).)  It is a plan written by the Agency to ensure "that services are
provided to the child and parents or other caretakers … in order to improve the conditions
in the parent's home, to facilitate the safe return of the child to a safe home or the
permanent placement of the child, and to address the needs of the child while in foster
care."  (§ 16501.1, subds. (a)(2) [goals] & (e) [written].)

The case plan has several components, including:  identifying the reasons for
dependency (§ 16501.1, subd. (g)(3); setting forth specific goals and describing why
planned services are appropriate to meet those goals (§ 16501.1, subd. (g)(2)); and
describing the services to be provided to assist in reunification (§ 16501.1,
subd. (g)(10.)).[3]

The case plan is generally written within 60 days of removing the child and must
be updated as the service needs of the family dictate.  (§ 16501.1, subd. (e).)  The case
plan must be updated with each status review hearing.  (*Ibid*.)  Between review hearings,
the casework supervisor may modify the case plan in furtherance of its goals without
court approval.  (§ 16501.1, subd. (g)(14).)

---

[3] Additional components include describing the child's placement and why it was
chosen (§ 16501.1, subd. (d)(1)); scheduling contacts between the agency and the child,
the family, or other caretakers (§ 16501.1, subd. (g)(4); setting the frequency of contact
between the parents and the child when out-of-home services are used (§ 16501.1,
subd. (g)(5)(A)); establishing how sibling relationships will be maintained during out-of-
home placement (§ 16501.1, subd. (g)(6)); planning for the child's educational stability
(§ 16501.1, subd. (g)(8).)

One reason the case plan is so important is that, in cases where the child was under three years old when removed, parents must be advised that failure "to cooperate or avail himself or herself of services provided as part of the child welfare services case plan may result in a termination of efforts to reunify the family after six months." (§ 361.5, subd. (a)(3)(C).)

The Agency submits the case plan to the court ahead of the dispositional hearing. (See § 358, subd. (b)(1).) The court must "consider[]" the case plan "at the initial hearing and each review hearing." (§ 16501.1, subd. (g)(14); see also § 358, subd. (b)(1); Cal. Rules of Court, rules[4] 5.708(b)(3), 5.706(b)(2).) The court reviews the plan to determine whether it satisfies the requirements of section 16501.1 (Rules 5.690(c)(2)(A)–(B)) and to verify that appropriate parties were consulted in its preparation (Rules 5.690(c)(2)(C)–(D), 5.708(e)(3)–(10).)

When the court orders a parent to participate in a program – such as parent education, counseling, parenting programs, etc. – the program must be "designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (d).) In other words, the court cannot arbitrarily order services that are "not reasonably designed" to eliminate the behavior or circumstances that led to the court taking jurisdiction of the child. (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 770–771.)

For this reason, it is helpful that the case plan must identify specific goals and then explain how the "planned services" are designed to achieve those goals. (§ 16501.1, subd. (g)(2).) By explaining how planned services are tied to specific goals, the case plan helps the court ensure these programs are in fact "designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (d).)

---

[4] Hereafter, "Rule."

B.	*Additional Background*

Here, the case plan identified the goal of returning the minors home to Mother's care. The case plan identified several "objectives" that services would seek to obtain:

"1. Stay sober and show your ability to live free from alcohol dependency.

"2. Stay free from illegal drugs and show your ability to live free from drug dependency. Comply with all required drug tests.

"3. Meet your children's physical, emotional, medical, and educational needs.

"4. Obtain and maintain a stable and suitable residence for yourself and your children.

"5. Pay attention to and monitor your children's health, safety, and well-being."

The case plan then listed the services aimed at accomplishing these objectives.

First, under the category of "Case Management Services" the plan provided that the Agency would offer at least one child-family-team meeting every six months.

Under the category of "Counseling/Mental Health Services," the plan provided that Mother would attend, actively participate and successfully complete an individual counseling program at Sierra Vista Child Family Services (or another approved program). The plan provided that individual counseling would focus on issues pertaining to: "domestic violence victim issues and correspondent anger, healthy coping skills, drug abuse and effects on children, demonstrating she can protect from future abuse and any other issues identified by the father and/or clinician." The plan also required that mother "follow all recommendations" of the counselor.

Under the category of "Education Services" the plan provided that Mother would attend, actively participate in, and successfully complete a parenting program offered at Sierra Vista Child Family Services (or another approved program). The plan also

13.

required Mother to "follow all recommendations" made by the parenting program clinicians.

Under the category of Substance Abuse Services, the plan required Mother to participate in an SUD assessment; "follow all recommendations from the assessment, which may include a substance abuse treatment program as offered by Nirvana Drug and Alcohol Treatment Program, Stanislaus Recovery Center or First Step Perinatal Program, or another program approved of by the Social Worker"; and "follow all recommendations of the program, including but not limited to, residential treatment, outpatient substance abuse services, clean and sober living, attending a 12-Step Program, and random drug testing as approved by the Social Worker."

Under the category of Substance Abuse Testing, the plan required Mother to participate in random drug testing.

C. *Analysis*

Mother raises several objections to the "follow all recommendations" language in the case plan's services section. We conclude the language does not satisfy section 16501.1.[5]

---

[5] Mother also contends the court erroneously delegated its judicial decisionmaking prerogative to the Agency. We do not characterize the issue here as one of improper delegation.

While Mother argues that it is ultimately the court's duty to "determine and fashion the appropriate case plan"; the statutory scheme actually indicates that the duty to fashion an appropriate case plan is the responsibility and prerogative of the child welfare agency, with the court playing a limited oversight role. Section 16501.1 clearly contemplates the case plan will be created by the agency. (See, e.g., § 16501.1, subds. (a)(3) ["The agency shall consider…"] & (g)(15)(A) ["The agency shall also include…"].) The court's role is more limited. The court is to read the case plan (§ 358, subd. (b)(1), Rule 5.708(b)(3)), verify appropriate parties were consulted in its preparation (Rules 5.690(c)(2)(C)–(D), 5.706(b)(2), 5.708(e)(3)–(10)), and ensure it complies with section 16501.1. (Rules 5.690(c)(2)(A)–(B), 5.708(e)(1)–(2).) Here, the court did not delegate its limited role.

Section 16501.1, subdivision (g)(2) requires that case plans "identify specific goals and the appropriateness of the planned services in meeting those goals." In other words, the case plan first establishes specific goals. It then must explain how the planned services prescribed for parents are related to those goals. Here, the "planned services" were the specific programs identified – e.g., individual counseling, a parenting program – *and any other services that might be recommended in the future* by the clinicians providing individual counseling, parenting, and substance abuse services. (Italics added.) The case plan does not – and indeed could not – "identify" how this latter category of unknown, potential future services were "appropriate" for meeting the case plan's goals. It is unknown what additional services the clinicians might recommend, which means it was also unknown whether and how those services were appropriate for meeting the case plan's goals. Since the case plan did not (and could not) explain how these services were "appropriate[]" to accomplish case plan goals, the case plan ran afoul of section 16501.1, subdivision (g)(2).

It is important to note the case plan itself placed no restrictions on the types of services that could be recommended by the clinicians. The Agency points to testimony at the contested hearing to show that the case plan's broad language would actually only be invoked in certain limited circumstances. For example, the Agency notes Cose testified that any additional sessions required by a clinician under the "all recommendations" language, would be "reasonable" in amount. The Agency also characterizes Cose's testimony as indicating that "recommendations are always made in light of the case plan goals."**6** Similarly, the Agency notes that statutes and case law necessary limits the "follow all recommendations" language. And, the juvenile court said the Agency would

---

**6** We do not agree with the Agency's characterization of Cose's testimony on this point. In any event, such testimony would not remedy the deficiency in the case plan itself.

15.

be ill-advised to "to add things that have no relation to any issues having to do with reunification" and, if they did, the court would be "happy to hear" a section 388 petition.

However, none of these restrictions and qualifications are in the case plan. And it is the case plan itself that must identify how planned services are "appropriate[]" to meet the plan's goals. (§ 16501.1, subd. (g)(2).)

The Agency argues that the "follow all recommendations" language is "needed" because previously-unknown "causes of [Mother's] behaviors could be revealed" at a later date. We absolutely agree that the Agency needs flexibility to modify or add services in response to additional needs identified by expert service-providers after the initial case plan is prepared. But the need for flexibility in such circumstances is addressed in subdivision (g)(14), which permits casework supervisors to modify the case plan without court approval. (§ 16501.1, subd. (g)(14).) In other words, as soon as a new need or issue is discovered, the social worker may adjust the case plan accordingly – as long as they identify how the new service is appropriate to accomplish specific goals.

In order to determine the "appropriateness" of a service to accomplish a particular goal, one must know the type of service being contemplated. A case plan cannot explain how the broad category of "all recommend[ed]" services is appropriate to satisfy specific goals, because the services to be recommended in the future are presently unknown. Thus, the statutory scheme necessarily contemplates that "planned services" will be identified *after* the corresponding parental need is "revealed"; not before.[7] When and if such a need is discovered, the casework supervisor may immediately modify the case plan to include services to address the need.

---

[7] For example, a case plan cannot include a substance abuse component before there is evidence the parent has a substance abuse problem. (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 172–173.) If evidence of a substance abuse problem subsequently arises, "the trial court can modify the reunification plan accordingly and order additional services. (§ 366.21, subd. (e).)" (*Id.* at p. 173, fn. 9.) Or, the casework supervisor could amend the case plan unilaterally. (§ 16501.1, subd. (g)(14).)

16.

We understand the Agency may prefer even more flexibility than provided by these rules; specifically, the flexibility to forego obtaining additional encumbrances when the need for new services arises. While we understand the Agency's preference, we do not believe it can be accommodated in light of section 16501.1, subdivision (g)(2). Moreover, social worker Avila testified that it would take her about one week to "take[] care" of an encumbrance. Such a delay, while regrettable, does not justify circumvention of the statutory requirements for a case plan. Even if the funding delay is usually lengthier than the timeframe offered by Avila, it would be a concern to raise with the Legislature so that appropriate statutory changes could be made. As currently written, the statute requires case plans to identify how services will accomplish specific goals. That cannot be done when a catch-all category of unknown future services is included.[8]

We hold that the case plan as currently drafted fails to satisfy section 16501.1, subdivision (g)(2), but we will not direct precisely how case plans must be worded, as the Agency has discretion in that regard.

Certainly, avoiding language as to any clinician "recommendations" would remedy the defect under subdivision (g)(2). Then, if any counselors or clinicians do recommend additional services, the social worker can modify the case plan, without court approval, to add those specific services (§ 16501.1, subd. (g)(14)) and identify how the new services are "appropriate[]" to remedy the plan's specific goals. (§ 16501.1, subd. (g)(2).)

Alternatively, we leave open the possibility that subdivision (g)(2) permits case plans to prospectively require that parents follow all recommendations of a clinician counselor as to a list of *specific* services – provided that the plan explains the "appropriateness" (§ 16501.1, subd. (g)(2)) of these potential, future services. For

---

[8] The Agency also contends that "follow all recommendations" language is beneficial because it notifies parents there may be changes to their case plan. But there is always the possibility of changes being made to a case plan, even without the "follow all recommendations" language. (See § 16501.1, subd. (g)(14).)

17.

example, a plan might identify domestic violence counseling as a planned service and add: "and follow any recommendations of the domestic violence counselor as to any need for family counseling, couples counseling, or anger management." The plan could then explain how these services would accomplish specific plan goals. Or, if appropriate, the plan could simply note that the potential recommended services are tied to plan goals for the same reasons as domestic violence counseling.[9]

What the case plan must *avoid* is identifying a category of services so broad as to include services for which there is no explanation of "appropriateness" under subdivision (g)(2). That is where the unqualified phrase "follow all recommendations" falls short.

### D. Harmlessness

"In general, harmless error analysis applies in juvenile dependency proceedings…." (*In re M.S.* (2019) 41 Cal.App.5th 568, 590.) Under harmless error analysis, "we must decide whether the error caused a miscarriage of justice." (*Id.* at p. 591.)

By using the "follow all recommendations" language, the case plan has prospectively included services without explaining how they are appropriate to accomplish plan goals. For this reason, it is not in compliance with section 16501.1, subdivision (g)(2). However, this error would only cause concrete harm to Mother if a clinician actually invokes this language and recommends a service for which the case plan has not identified a connection to plan goals. And, as explained below, there is reason to believe that is unlikely to occur in this case.

We rejected the Agency's argument that the contested language in the case plan satisfies subdivision (g)(2) because its scope is cabined by statements extrinsic to the case plan, such as the testimony offered at the contested hearing. That is because subdivision (g)(2) requires the case plan itself to identify the appropriateness of each service to

---

[9] Provided, of course, that the plan already explains how domestic violence counseling is "appropriate[]" under subdivision (g)(2).

accomplish the specific goals of the plan.  However, these extrinsic sources *are* relevant to the issue of whether the inclusion of the overly broad language in the case plan will actually be invoked in a way to prejudice Mother.

Social worker Avila identified the specific additional services that could be recommended by the various clinicians (e.g., individual counselors, parenting education clinicians), apparently limiting the ways the Agency planned to invoke the broad language.  For example, Avila testified that the "follow all recommendations" language is important for parental education services because "sometimes there's a recommendation to add additional parent/child labs or other additional parenting classes that would be beneficial to the parent."

Additionally, Cose testified that Sierra – the service provider who would make recommendations under the "follow all recommendations" language – would not make unreasonable recommendations such as requiring 200 additional sessions.  When asked what type of services are typically recommended by Sierra, Cose identified a list of possibilities:  individual counseling, anger management, domestic violence (batterer or victim groups), and psychological evaluations.

Moreover, even if the Agency transgressed these self-imposed limitations, Mother could raise the issue with the court.  The court expressly invited the parents to file a section 388 petition if the Agency "added things" that had "no relation to any issues having to do with reunification."  Indeed, the court strongly indicated it would be inclined to grant such a petition – saying that if the agency did require unrelated services, "then I'll be more than happy to hear your 388 to address it."

In sum, representations by Mother's service-provider and the Agency's social worker indicated that there was little likelihood the broad "all recommendations" language would be invoked in a manner prejudicial to Mother.  And the record indicates that even if the Agency attempted require unrelated services, Mother had a clear avenue to prevent the Agency from doing so: a section 388 petition that would be viewed

favorably by the court.  In these circumstances, we conclude the inclusion of broad language in the case plan was harmless.

II.      We Find No ICWA Violation*

Mother contends "the [c]ourt failed to order the Agency to inquire of mother concerning her relatives' information and notice the Bureau of Indian Affairs …" and that therefore the dispositional orders should be reversed.

*A.      Background*

On an ICWA-020 form, Mother checked a box indicating she "may" have Indian ancestry.

At a hearing on July 5, 2019, the following exchange took place:

"THE COURT:  And, [Mother], you indicated that you may have Native American ancestry."

"THE MINORS' MOTHER:  Yes.

"THE COURT:  Do you happen to know any particular tribe?

"THE MINORS' MOTHER:  My mom and dad are both passed already.

"THE COURT:  So you have no one with whom you could inquire?

"THE MINORS' MOTHER: [Shakes head]

"THE COURT: All right.  Because if you don't have any information, the Court can't – doesn't really have any information to believe the Indian Child Welfare Act applies.  [¶]  In the event you figure out someone or you get some information, make sure you let us know as soon as you obtain that information so that inquiries can be sent out.  But in the meantime, the Court will find that there is not sufficient information upon which to believe that the Indian Child Welfare Act applies."

*B.      Notice*

Mother argues that ICWA requires notice "where the court knows or has reason to know that an Indian child is involved."  (25 U.S.C. § 1912(a); see also § 224.2, subd. (f);

---

\* See footnote, *ante*, page 1.

20.

Cal. Rules of Court, rule 5.481(b).) The Agency argues that the information Mother provided is too vague, attenuated and speculative to constitute "reason to know that an Indian child is involved." As a result, the notice requirements were not triggered. We agree with the Agency.

The phrase "Indian children" has specific meaning in ICWA and California's related statutes. It refers to minors who are either "a member of an Indian tribe" or are "eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(3); see also § 224.1, subd. (a).) As a result, telling the court that a minor's parent might have Native American ancestry is not equivalent to "inform[ing] the court" [citation] that the minors were Indian children, i.e., that they were either members of a tribe or the biological children of tribal members and eligible for membership." (*In re O.K.* (2003) 106 Cal.App.4th 152, 157.) Notifying the court that a parent "may have Indian [ancestry]" is "insufficient to give the court reason to believe that the minors might be Indian children." (*Ibid.*)

Put plainly, "a claim that a parent, and thus the child, 'may' have Native American heritage is insufficient to trigger ICWA notice requirements if the claim is not accompanied by other information …." (*In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1516.)

Here, Mother offered only a claim that she "may" have Indian ancestry. This was insufficient to trigger ICWA notice requirements. (*In re Jeremiah G.*, *supra*, 172 Cal.App.4th at p. 1516; *In re O.K.*, *supra*, 106 Cal.App.4th at p. 157.) Therefore, the court did not err in failing to require ICWA notice.

C.    *Inquiry*

Mother claims the Agency failed to satisfy its duty of inquiry.

"Section 224.3, subdivision (a) places an 'affirmative and continuing duty' on the court and county welfare department in a dependency proceeding to 'inquire whether a child … is or may be an Indian child.…' " (*In re Hunter W.* (2011) 200 Cal.App.4th

21.

1454, 1466.) Thus, if the court or social worker knows or has reason to believe that an Indian child is involved, the social worker is required to make further inquiry. (*Ibid*.; see also § 224.2, subd. (e).) Such further inquiry includes interviewing extended family members and contacting the Bureau of Indian Affairs. (§ 224.2, subd. (e).)

Mother indicated she may have Indian heritage, but did not identify the particular tribe or nation, and did not know of any relative with whom she could inquire about Native American heritage. This information does not provide a sufficient "reason to believe" (§ 224.2, subd. (e)) the minors were Indian children so as to trigger the duty of further inquiry. (See *In re Hunter W.*, *supra*, 200 Cal.App.4th at p. 1468.)

Additionally, while "Mother argues that [the Agency] could have questioned her remaining relatives for more information … this does not address the issue of whether the information *mother* provided was sufficient to trigger this duty." (*In re Hunter W.*, *supra*, 200 Cal.App.4th at p. 1468.)

Mother argues *Hunter W.* is distinguishable because the court in that case knew the source of the parent's Indian ancestry claim. But *Hunter W.* concluded that even with that information, the duty of further inquiry was not triggered. The fact that there is even less information known in this case only strengthens the Agency's argument.

Mother also argues that the court in *Hunter W.* knew whether the parent "had any living relatives with more information …." But the court knew that information in this case, too. Mother told the court her own parents were deceased. The court asked if there was anyone else with whom she could inquire about the ancestry, and she shook her head.

Mother argues the court should have asked her whether she had any living relatives, among other questions. But the court specifically asked Mother if she had anyone with whom she could inquire about Native American ancestry. The court then instructed Mother to inform the court if she received additional information. This satisfied the court's duty at the initial hearing. (See § 224.2, subd. (c).)

22.

We find no ICWA error.

## DISPOSITION

The dispositional orders are affirmed.

POOCHIGIAN, Acting P.J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.